UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Case No. 24-cr-371 (JEB) |
| v. : | |
| : | |
| NICOLE MARIE JOYNER : | |
| : | |
| Defendant. : | |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
REQUEST FOR SPECIAL ACCOMODATION DURING TRIAL**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this response to the Defendant's Request for Special Accommodation During Trial. The defendant seeks to have her therapy dog present with her in Court during trial. ECF No. 32. The government opposes this request for the reasons below.

### BACKGROUND

Before traveling from Florida to Washington, D.C., on January 3, 2021, Joyner took to social media to share a photo of an article with the headline, "GOP senators, led by Cruz, to object to Electoral College certification, demand emergency audit." On January 5, 2021, Joyner sent a message on Facebook saying, "There is NO CHAOS IN DC just a Storm of Patriots telling the corrupted DC officials We ain't taking this shit no more."

The following day, January 6, 2021, Joyner and her partner at the time, Joseph Lapoint,[1] attended a rally on the National Mall. However, as Joyner would later recount on Instagram, they remained near the back of the crowd so that they could get to the Capitol.

---

[1] Lapoint pled guilty to one count each of 40 U.S.C. § 5104(e)(2)(D) & (G) on July 18, 2024, in connection with his participation in the riot at the U.S. Capitol on January 6, 2021. *See United States v. Lapoint*, 24-cr-241-JEB.

1

Joyner and Lapoint were two of the first people to arrive on the West side of the Capitol Grounds. There they were able to observe interlocking bicycle rack barricades surrounding the grounds, bearing signs with the words, "area closed," and uniformed police officers manning those barricades. No rioter there had yet entered the restricted area around the Capitol Grounds. Joyner then watched as rioters violently broke through those barriers and the police line near the Peace Circle, and soon thereafter, followed them onto Capitol Grounds. As a large crowd of rioters amassed on the Lower West Terrace of the Capitol and continued to engage the police with violence. The police attempted to deter the rioters with flashbang grenades, among other measures. One flashbang grenade struck Lapoint directly and exploded in his and Joyner's vicinity.

Not only did Joyner remain with this dense and violent crowd, but when the crowd broke through additional police lines and surged towards the Upper West Terrace of the Capitol, Joyner again followed. Joyner entered the Capitol through the Senate Wing Door over the sound of a blaring alarm, filming the scene on her phone. She remained inside the Capitol for over 20 minutes, and even after exiting, remained on the Upper West Terrace of the Capitol until the police deployed tear gas to clear the area.

At no point was Joyner with her dog.

In connection with her actions at the U.S. Capitol on January 6, 2021, Joyner was charged in a four-count information with: (1) Entering And Remaining In A Restricted Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count One); (2) Disorderly And Disruptive Conduct In A Restricted Building Or Grounds, in violation of 18 U.S.C. § 1752(a)(2) (Count Two); (3) Disorderly Conduct In A Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Three); and (4) Parading, Demonstrating, Or Picketing In A Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Four). ECF No. 21.

# ARGUMENT

The defendant should not be permitted to have her dog in the courtroom because it risks distracting or improperly influencing the jury. The defendant does not – and cannot – point to a legal basis for having her dog present at her trial because her dog does not qualify as a service animal under the Americans with Disabilities Act (ADA).

The presence of the defendant's dog would be unduly prejudicial to the government. Fed. R. Evid. 403. Not only would the presence of the dog risk distracting the jury, but the jury may be improperly influenced in the defendants favor by watching her interact with the dog. At least one other court has excluded a support animal from the courtroom pursuant to Rule 403, where the animal did not qualify as a service animal under the ADA. *See Falin v. Condo. Ass'n of La Mer Ests., Inc.*, 2012 WL 6569333, at *4 (S.D. Fla. June 15, 2012) ("Plaintiff identifies no provision of federal law that requires an animal, other than a trained service animal, to be admitted to a federal courthouse.") (citing 28 C.F.R. § 36.104 (explaining that public-accommodation provisions of Americans with Disabilities Act apply only to trained service animals)).

While ADA does provide for certain public accommodations for service animals, "service animal" is a precisely defined term that expressly excludes emotional support animals such as therapy dogs:

> The ADA's implementing regulations define "service animal" as "any dog that is individually trained to do work or perform tasks for the benefit of an individual with a disability, including a physical, sensory, psychiatric, intellectual, or other mental disability." 28 C.F.R. § 35.104. Besides dogs, no other animal may be a service animal. And the tasks which the service animal performs "must be directly related to the individual's disability." *Id.* Importantly, "[t]he crime deterrent effects of an animal's presence and *the provision of emotional support, well-being, comfort, or companionship do not constitute work or tasks for the purposes of this definition*." *Id.* Given how narrow this definition is, district courts have unanimously concluded that household pets are not service animals under the ADA and its regulations.

3

*Silva v. Lee Cnty.*, 2021 WL 4772854, at *4 (M.D. Fla. Oct. 13, 2021) (emphasis added); *see also Baird v. 1600 Church Rd. Condo. Ass'n*, 2017 WL 5570333, at *4 (E.D. Pa. Nov. 17, 2017) ("[T]he ADA does not provide protection for emotional therapy dogs as accommodations for disabilities…emotional support or emotional therapy dogs do not qualify as service animals under the ADA.") (citing *Houston v. DTN Operating Co., LLC*, 2017 WL 4653246, at *6 (E.D. Tex. Oct. 17, 2017)).

Moreover, the individual training required for a support animal to be considered a service animal under the ADA is specific – even where a service animal is trained by its owner to help with a disability, it does not qualify as a service animal unless trained to do work or perform tasks related to the owner's disorders and amounting to more than providing comfort. *See Rose v. Springfield-Greene Cnty. Health Dep't*, 668 F. Supp. 2d 1206, 1215-16 (W.D. Mo. 2009), *aff'd sub nom. Rose v. Cox Health Sys.*, 377 F. App'x 573 (8th Cir. 2010). There, the plaintiff alleged that she trained her support animal to help her complete tasks which helped her cope with her anxiety, including "tolerat[ing] … a position for hours so Plaintiff can focus without anxiety" and "sitting on her lap for as long as it takes to relieve the emotional overload." *Id.* However, without casting doubt on the therapy animal's value to the plaintiff, the court explained that such tasks only amounted to provision of comfort and support, holding that, "an animal that simply provides comfort or reassurance is equivalent to a household pet, and does not qualify as a service animal under the ADA." *Id*.

Here, the defendant's motion explains only that the dog "help[s] prevent further issues to include trauma-triggered episodes." ECF No. 32 at 2. However, the defendant does not allege that the dog has been specifically trained to do work or perform tasks for her benefit, let alone what those tasks are and how they relate to the defendant's disability. As in *Rose*, simply providing

comfort, even where the defendant has a legitimate medical diagnosis,[2] does not suffice to bring the defendant's therapy animal within the ambit of the ADA.

## CONCLUSION

As defendant's requested accommodation is inadequately supported and risks prejudice to the government's case, the Court should deny the motion.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Alexander Diamond*
ALEXANDER DIAMOND
NY Bar No. 5684634
Assistant United States Attorney
District of Columbia
601 D St. NW
Washington, DC 20530
Alexander.diamond@usdoj.gov
(202) 506-0427

---

[2] Without scrutinizing the defendant's medical diagnosis, about which no details are provided, the ADA requires more for its protections to attach: an impairment must be "substantially limiting", defined as "render[ing] an individual unable to perform a major life activity that the average person in the general population can perform, or if it significantly restricts the condition, manner or duration under which an individual can perform such an activity compared to the general population." *Rose,* 668 F. Supp. 2d 1206, 1213 (citing *Cooper v. Olin Corp., Winchester Div.,* 246 F.3d 1083, 1088 (8th Cir.2001)). Where a person is not substantially limited, they do not meet the requirements of the ADA. *See id.* (explaining that the defendant successfully performed major life activities "without the use of a service animal"). It is notable that the defendant spent some three hours partaking in a densely packed riot despite the extreme stressors of verbal and physical confrontation, exploding flashbang grenades, and chemical deterrents without having her therapy dog.