### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **Case No. 24-CR-371 (JEB)** |
| **v.** | : | |
| | : | |
| **NICOLE MARIE JOYNER,** | : | |
| | : | |
| **Defendant.** | : | |

### GOVERNMENT'S OPPOSITION TO
### DEFENDANT'S FIRST AND SECONDMOTIONS IN LIMINE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits its Opposition to the defendant Nicole Joyner's First and Second Motions *in limine*. ECF Nos. 28 and 45. In essence, each motion relies on Federal Rules of Evidence 401 and 403 in seeking the exclusion of relevant evidence that is not unduly prejudicial, or to cabin the government's ability to plainly describe the events of January 6, 2021 for what they were – an "attack on democracy." The defendant's motions should be denied.

### <u>BACKGROUND</u>

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate convened to certify the vote of the Electoral College of the 2020 U.S. Presidential Election.  As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the Capitol, forced entry onto the restricted grounds, and stormed the Capitol Building.  As a result, Congress' Joint Session ceased until law enforcement was eventually able to clear the Capitol of hundreds of unlawful occupants and ensure the safety of elected officials.

Before traveling from Florida to Washington, D.C., on January 3, 2021, Joyner took to social media to share a photo of an article with the headline, "GOP senators, led by Cruz, to object

to Electoral College certification, demand emergency audit." On January 5, 2021, Joyner sent a message on Facebook saying, "There is NO CHAOS IN DC just a Storm of Patriots telling the corrupted DC officials We ain't taking this shit no more."

The following day, January 6, 2021, Joyner and her partner at the time, Joseph Lapoint,[1] attended a rally on the National Mall. However, as Joyner would later recount on Instagram, they remained near the back of the crowd "so that way we could get to the Capitol first."

Joyner and Lapoint were two of the first people to arrive on the West side of the Capitol Grounds. There they were able to observe interlocking bicycle rack barricades surrounding the grounds, bearing signs with the words, "area closed," and uniformed police officers manning those barricades. No rioter there had yet entered the restricted area around the Capitol Grounds. Joyner then watched as rioters violently broke through those barriers and the police line near the Peace Circle, and soon thereafter, followed them onto Capitol Grounds. A large crowd of rioters amassed on the Lower West Terrace of the Capitol and continued to engage the police with violence. The police attempted to deter the rioters with flashbang grenades, among other measures. One flashbang grenade struck Lapoint directly and exploded in his and Joyner's vicinity.

Not only did Joyner remain with this dense and violent crowd, but when the crowd broke through additional police lines on the Northwest stairs and surged towards the Upper West Terrace of the Capitol, Joyner again followed. She remained with the crowd there for nearly an hour.

At around 3:08 p.m., more than two hours after she first joined the mob, Joyner entered the Capitol building through the Senate Wing Door. Police were visible, an alarm blared, and rioters, including Lapoint, chanted inside the building. Joyner and Lapoint next walked toward the Crypt.

---

[1] Lapoint pled guilty to one count each of 40 U.S.C. § 5104(e)(2)(D) & (G) on July 18, 2024, in connection with his participation in the riot at the U.S. Capitol on January 6, 2021. *See United States v. Lapoint*, 24-cr-241-JEB.

They entered an office where Joyner photographed Lapoint jumping up onto a windowsill that faced a police line, clearly visible outside. Joyner and Lapoint exited the office and made their way to the Crypt.

Over 20 minutes after entering the building, Joyner left through the Senate Wing Door. She remained on the Upper West Terrace of the Capitol near the Senate Wing Door until police were able to clear the area some time later.

## ARGUMENT

Though split into eleven requests across two motions, the defendant's motions in limine boil down to four primary arguments: (1) the government should be prohibited from using specific terms or themes because they would be unfairly prejudicial, (2) the government should be prohibited from introducing evidence of the violence, damage, and injuries caused by the mob on January 6, 2021, either collectively or through particular individuals and groups, because it is irrelevant and unfairly prejudicial, (3) the government should be prohibited from introducing evidence of Lapoint's statements or actions on January 6, 2021 in particular, because they will be unfairly prejudicial, and (4) the government should be prohibited from presenting evidence deemed "embarrassing" or irrelevant or "designed to influence the jury through prejudice. These arguments, all of which must fail, are addressed in turn below.

**1. The Court should not mandate sterilized descriptions of the January 6 attack.**

The Court should reject Joyner's request to prohibit the government from "using themes or terminology suggesting" an insurgency, insurgents, an attack/threat on democracy, an attack, or the overthrow of the government/elected government. *See* ECF No. 28 at 1, 4-7 (First Motion *in Limine*, Items 1-3). Evidence or language is unfairly prejudicial if it has "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."

*United States v. Sanford Ltd.*, 878 F. Supp. 2d 137, 143 (quoting Fed. R. Evid. 403, advisory committee's note). However, Rule 403 does not require the government "to sanitize its case, to deflate its witnesses' testimony or to tell its story in a monotone." *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998). By their very nature, criminal charges involve an accusation that someone has wronged another person, or has wronged society—thus, by their nature, criminal charges arouse emotion. And there is nothing improper about that. Indeed, while cautioning against prosecutorial misconduct in *United States v. Berger*, the Supreme Court simultaneously recognized that "The United States Attorney . . . may prosecute with earnestness and vigor — indeed, he should do so." 295 U.S. 78, 88 (1935). "[T]he law permits the prosecution considerable latitude to strike 'hard blows' based on the evidence and all reasonable inferences therefrom." *United States v. Rude*, 88 F.3d 1538, 1548 (9th Cir. 1996) (*quoting United States v. Baker*, 10 F.3d 1374, 1415 (9th Cir. 1993)). When a prosecutor's comments fairly characterize the offense, fairly characterize the defendant's conduct, and represent fair inferences from the evidence, they are not improper. *Cf. Rude*, 88 F.3d at 1548 (the use of inflammatory words like victim, deceit, outlandish, gibberish, charlatan, and scam was not improper); *Guam v. Torre*, 68 F.3d 1177, 1180 (9th Cir. 1995) ("there is no rule [of evidence or ethics] requiring the prosecutor to use a euphemism for [a crime] or preface it by the word 'alleged.'").

Here, the government should not be required to water down its language and step gingerly around the significance of Joyner's crimes. The riot on January 6, 2021, was an attack on the United States Capitol, the government of the United States, and American democracy. In fact, after carefully considering the facts of other January 6 cases, many judges of this District, including this court, have recognized the riot as just such an attack. *See*, *e.g.*, *United States v. Mostofsky*, 1:21-cr-138 (JEB), Sent. Tr. at 40–41, May 6, 2022 (describing the riot as an "attack," describing

the Capitol as "overrun," and describing Mostofsky and other rioters as engaged in "an attempt to undermine [our] system of government."); *United States v. Languerand*, 1:21-cr-353 (JDB), Sent. Tr. at 33–34, January 26, 2022 ("the effort undertaken by those who stormed the Capitol . . . involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part."). None of this language is hyperbole; rather, these findings used vivid and violent language because they described a visceral and violent event. So, too, will prosecutors and witnesses need to use accurate language—and not euphemisms—to describe the nature and gravity of Joyner's conduct. This Court should reach the same conclusion it did in *United States v. Carpenter* and permit the government to use these "accurate descriptors" to characterize the events of January 6, 2021. *See* No. 21-cr-305, 2023 WL 1860978 at *4, (D.D.C. February 9, 2023)

### 2. The Court should not preclude references to violence, damage, or injuries caused by the mob in which Joyner participated.

Joyner next argues that the Court should exclude evidence or argument about any injuries sustained, any damage to the Capitol, and any violent action taken by rioters, either individually or collectively through the actions of the mob, because it does not apply to Joyner's case and would be unfairly prejudicial. *See* ECF No. 28 at 2, 7-8 (First Motion *in Limine*, Items 4-7); ECF No. 45 at 2 (Second Motion in Limine, Item 1). However, Joyner's argument ignores two key concepts: first, collective action is the nature of the crime – it was the mob's collective force that in fact disrupted Congress, and second, the government must prove Joyner's knowledge and intent when she entered a restricted area and engaged in disruptive and disorderly conduct, which puts the (often violent and disruptive) behavior of other, nearby rioters at issue.

In *Carpenter*, this Court explained that "the Government must be given leeway to place a defendant's actions into context," and further, that "general evidence of the events of January 6 is probative of several elements of the crimes with which [defendant] is charged." 2023 WL 1860978 at *3 (internal quotations omitted). The Court of Appeals for the D.C. Circuit similarly reasoned that determining whether conduct was disorderly or disruptive requires a context-dependent inquiry that takes into consideration the surrounding circumstances. *See United States v. Alford*, 89 F.4th 943, 949–53 (D.C. Cir. 2024) (interpreting the terms "disorderly" and "disruptive" as they are used in 18 U.S.C § 1752 and 40 U.S.C. § 5104). Indeed, as the Court of Appeals put it, "entering the Capitol as part of a crowd rather than as a lone individual magnified the disruptiveness of [the defendant's] presence. Each additional person, no matter how modestly behaved, increased the chaos within the building, the police's difficulty in restoring order and the likelihood of interference with the Congress's work." *Id.* at 953. Thus, "[t]he jury was not required to view [the defendant's] actions in isolation as though he were the only one at the Capitol that day." *Id; see also United States v. MacAndrew*, No. CR 21-730 (CKK), 2022 WL 17961247, at *3 (D.D.C. Dec. 27, 2022) ("[T]he introduction of the conduct of others in this case is neither prejudicial nor surprising… "general" evidence is a far cry from *Defendant's* prior "bad acts" that implicate any risk of prejudice.") Joyner joined a mob, and the circumstances-dependent inquiry, endorsed by the Court of Appeals in *Alford*, makes the conduct of other individuals in that mob relevant to Joyner's offenses.

Though relevant evidence is of course subject to the balancing test of Fed. R. Evid. 403, it is not enough that the evidence is simply prejudicial; the prejudice must be "unfair." *Cassell*, 292 F.3d at 796 (quoting *Dollar v. Long Mf'g, N.C., Inc.*, 561 F.2d 613, 618 (5th Cir. 1977) for the proposition that "[v]irtually all evidence is prejudicial or it isn't material. The prejudice must

be 'unfair.'"); *United States v. Pettiford*, 517 F.3d 584, 590 (D.C. Cir. 2008) ("[T]he Rule focuses on the danger of *unfair* prejudice, and gives the court discretion to exclude evidence only if that danger *substantially* outweigh[s] the evidence's probative value.") (citations and punctuation omitted) (emphasis in original). The defendant's concern appears to be that the jury might infer from the government's evidence that the defendant was a supportive participant in the chaos and violence sown by the mob. But that is exactly what the government seeks to, and must, prove – the "probative force of the[] [evidence] creates any prejudice resulting from them and thus there [is] no unfair prejudice." *Hale-Cusanelli* at 12-13 (citing *United States vs. Wilkins*, 538 F.Supp.3d 49, 73 (D.D.C. 2021)) (admitting defendant's statements advocating civil war over Rule 403 objection in January 6 case, despite risk a jury might "react negatively," because any prejudice was not unfair) (internal quotations omitted).

Testimony from law enforcement officers, who worked to secure the Capitol building on January 6, 2021, will make clear how the mob's collective action disrupted Congress. These officer witnesses will explain that they could not distinguish between "peaceful" rioters and violent ones, could not predict who would act violently; any member of the crowd might be a threat. Indeed, throughout the day, individual officers found their attention divided by the need to monitor the whole crowd, rather than focusing on a specific individual. The size of the crowd enabled the worst of the rioters, and Congress could not resume its business until all of them were expelled. In providing testimony about the riot, officers should not be forced to sanitize their experience, including the injuries they received or damage they witnessed. The injuries to individuals and the building itself were part and parcel of the disruption caused by the riotous mob, including Joyner.

Moreover, the significant violence occurring in front of Joyner is directly related to her knowledge and intent when she committed the crimes charged. Before Joyner herself stepped

foot in the restricted area surrounding the Capitol Building on January 6, 2021, she watched from feet away as a violent crowd dismantled barricades and knocked over the uniformed police officers guarding them, seriously injuring officers in the process. This is not rendered irrelevant simply because Joyner did not herself injure the officers. This is evidence that Joyner understood she was not merely attending a peaceful protest in a public location, but rather, joining a violent mob in breaching a restricted space.[2] The same goes for the violence, damages, and injuries she witnessed on the Lower West Terrace, the Upper West Terrace, and inside the U.S. Capitol.

Accordingly, the Court should reject Joyner's request to remove mention of the context for the charged offenses.[3]

### 3. The Court should not prohibit the government from offering adverse evidence related to Joseph Lapoint where relevant to the defendant's own actions, knowledge or intent.

It follows from the above arguments that evidence of the actions taken and statements made by Lapoint, with whom the defendant traveled to Washington, D.C. and stormed the United States Capitol, should not be categorically excluded in this case. *See* ECF No. 45 at 1, 4-5 (Second Motion *in Limine* items 2-3).[4] As with the other members of the mob who stormed the Capitol alongside Joyner, Lapoint's statements and actions are often relevant to the defendant's knowledge and intent.

---

[2] Indeed, the definition of "knowingly" endorsed by both parties expressly instructs the factfinder to "consider all of the evidence, including what the defendant did, said, or *perceived*." *See* ECF Nos. 24-1 at 2 and 42 at 4 (emphasis added).

[3] The defendant's Second Motion in Limine specifically seeks to preclude "mentioning or using anything associated with the Proud Boys." ECF No. 45 at 2. The government is not aware of Joyner (or Lapoint) specifically associating with the Proud Boys, and thus does not intend to argue such a connection. However, the Proud Boys were one of numerous groups that took deliberate, violent, collective action at the U.S. Capitol on January 6, 2021, and as described, such evidence is relevant at a general level.

[4] Item 2 of the defendant's Second Motion in Limine more specifically seeks to exclude mention of Lapoint's "legal status." If the defense means to exclude reference to Lapoint's guilty plea, or the sentence to be rendered by the Court on October 16, 2024, the government does not intend to raise this in trial.

The defendant points to evidence of Lapoint climbing on a windowsill in a private office of the Capitol as an example of the adverse evidence that would unfairly prejudice the defendant. However, this example only serves to highlight the government's point: the defendant herself took photographs of Lapoint as he behaved in this disorderly way. Therefore, Lapoint's disorderly behavior here demonstrates Joyner's awareness and support of the disruptive behavior of the mob she had joined. Moreover, because Lapoint and Joyner traveled together throughout the day, evidence of what Lapoint observed, including video footage from Lapoint's phone, is also relevant to what Joyner herself perceived.

The only prejudice the defendant identifies in arguing the exclusion of this relevant evidence is the risk of conviction by association with Lapoint's disruptive and disorderly behavior. But this allegation of prejudice rings hollow. In another January 6 case, the court explained that the defendant's calls to Congressional offices threatening civil war ahead of the certification of the electoral college vote were not unfairly prejudicial because they were not more sensational than the crimes charged. *See United States v. Fitzsimons*, 605 F. Supp. 3d 92, 101 (D.D.C. 2022) ("[E]vidence is typically not barred by Rule 403 where such evidence did not involve conduct any more sensational or disturbing than the crimes with which the defendant was charged.") (internal citations omitted). The same is true here. Joyner will stand trial for her own disruptive behavior and the government will not argue at trial that Joyner is criminally responsible for Lapoint's behavior, statements, or political views. There is little risk that the jury will convict Joyner on the improper basis of an emotional response to Lapoint's substantially similar behavior on January 6. If this does not satisfy the Court, a limiting instruction, not exclusion, is the proper mechanism for addressing any risk of residual prejudice.[5]

---

[5] The D.C. Circuit has consistently upheld the use of limiting instructions as a way of minimizing the residual risk of prejudice. *See, e.g.*, *United States v. Douglas,* 482 F.3d 591, 601 (D.C. Cir.

**4.  The Court should not preemptively prohibit the government from offering evidence of Joyner's relevant statements.**

Finally, without referencing any specific piece of evidence, Joyner asks the Court to preclude "any embarrassing and/or irrelevant statements or videos" of Joyner. *See* ECF No. 28 at 2 (First Motion *in Limine*, Item 8). Of course, the government does not intend to present evidence that runs afoul of Federal Rules of Evidence 401 or 403. To the extent that evidence of Joyner's statements and behavior, however embarrassing, demonstrate her criminal behavior on January 6, or otherwise reflect her intent, motive, or planning to commit the charged offenses, those statements are plainly relevant, and the jury has a right to hear them, unless their probative value is substantially outweighed by undue prejudice. *See* Fed. R. Evid. 403. The Court, therefore, should reject Joyner's request to artificially limit the admissibility of statements in the abstract.

---

2007) (emphasizing the significance of the District Court's instructions to jury on the permissible and impermissible uses of the evidence); *Pettiford*, 517 F.3d at 590 (same); *Crowder II*, 141 F.3d at 1210 (stating that mitigating instructions to jury enter into the Rule 403 balancing analysis).

## CONCLUSION

For the foregoing reasons, the defendants Motions *in limine*, ECF Nos. 28 and 45, should be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052

By:   */s/ Alexander Diamond*
ALEXANDER M. DIAMOND
NY Bar No. 5684634
SARA E. LEVINE
VA Bar No. 98972
Assistant United States Attorney
District of Columbia
601 D St. NW
Washington, DC 20530

11